**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**UNITED STATES OF AMERICA**

**v.** **Case No. 3:25-CR-00132**

**MARLON LEFTWICH**

# DEFENDANT'S SENTENCING MEMORANDUM

COMES NOW the Defendant, Marlon Leftwich, by his counsel, and submits this Memorandum outlining the various 18 U.S.C. § 3553(a) factors for the Court's consideration at his upcoming sentencing hearing. For the reasons set forth below, Leftwich requests a sentence of 210 months' imprisonment.

## I. BACKGROUND

Marlon Maurice Leftwich is a 46-year-old military veteran and lifelong resident of West Virginia. He suffers from a litany of physical and mental health issues that, as will be discussed in greater detail below, will require significant treatment and monitoring while in custody and will make his custodial experience far more difficult than it would be for the average prisoner.

Leftwich was born in Charleston in 1980 and was raised in a loving home where his family went to church, took regular family vacations, and supported him through school where he played football, basketball, and baseball all while maintaining a 3.0 GPA. After graduating from Saint Albans High School in 1998, he joined the Air Force in 1999, serving until he was honorably discharged at the rank

of Technical Sergeant in 2013. While in the Air Force, Leftwich served combat deployments in Afghanistan and Uzbekistan from 2002 until 2006, ultimately earning numerous decorations and awards including representing the Air Force at the West Virginia State of the State Address in 2004.

Although he did work at Prestera from 2020 to 2021 and attempted to pursue a degree in graphic design from Marshall University, most of Leftwich's post-military life has been affected by his numerous physical and mental health issues, many of which are attributed to his military service. In addition to suffering from PTSD (as well as anxiety and depression), he suffered a significant back injury that ultimately led to him undergoing two major vertebrae fusion surgeries in 2020 and 2022 and the placement of a spinal cord stimulator. His back issues are further complicated by his sacroiliac (SI) joint disfunction while also exacerbating his GI issues – including irritable bowel syndrome and an irregular bowel tract. As if those conditions were not enough, Leftwich also suffers from sleep apnea, hypertension, and glaucoma. These conditions have rendered him unable to work, forcing him to subsist on Social Security Disability Income (SSDI) and Veterans Affairs (VA) benefits.

Despite his medical problems, Leftwich forged a stable life after returning to West Virginia following his discharge from the Air Force. Although he has never been married, he fathered two children (ages 12 and 16) who live in the Huntington area and with whom Leftwich had maintained a close relationship, including having primary custody and being responsible for their care. He also maintains a close

relationship with his three siblings, two of whom reside near Huntington, as well his mother and father (until his father's recent passing in July 2026).

Leftwich was charged in a two-count Indictment on July 22, 2025, with Production of Child Pornography in violation of 18 U.S.C. §§ 2251(a) and (e) (Count One) and Possession of Child Pornography in violation of 18 U.S.C. §§ 2252A(a)(5)(B) and 2252A(b)(2) (Count Two), and on July 1, 2026, he pleaded guilty pursuant to a Rule11(c)(1)(C) plea agreement to Count One. The PSR has been drafted and revised and there are three outstanding objections that will require a ruling from the Court. Regardless, the Rule 11(c)(1)(C) plea agreement requires the Court to impose a sentence of at least 210 but no more than 262 months' imprisonment. For the reasons set forth below, Leftwich is requesting that the Court impose a sentence at the bottom of that agreed-upon range.

## II. SENTENCING FACTORS

In post-*Booker* sentencing, district courts are to calculate the appropriate Guideline range, consider that range in conjunction with other relevant factors under 18 U.S.C. § 3553(a), and impose a sentence. In this case, a sentence of 210 months' imprisonment would be sufficient, and not greater than necessary:

### (1) The nature and circumstances of the offense and the history and characteristics of the defendant;

The Court rightly can, and should, account for his military service (as well as his service to his community) when imposing sentence. *See Porter v. McCollum*, 558 U.S. 30, 43-44 (2009) (per curiam) ("Our Nation has a long tradition of according leniency to veterans in recognition of their service, especially for those who fought on

the front lines.") Here, Leftwich has two combat deployments, a lack of any disciplinary history, a list of medals and awards, and an honorable discharge. An injury suffered in the military has left him with PTSD and rendered him unable to work, all of which will make his time in custody to be extraordinarily difficult. Due consideration for his service is warranted and further supports a sentence at the bottom of the parties' agreed-upon range.

As to the nature and circumstances of the offense, Leftwich has not always had an addiction to child pornography. Rather, he began watching adult pornography regularly a few years ago after he hurt his back and was prescribed pain medication, which he began mixing with alcohol. That combination of mind-altering substances lowered his inhibitions and began a downward spiral into a pornography addiction, which eventually led "down a rabbit hole" into child pornography. Scientific studies have shown that viewing pornography can lead to unwanted sexual attractions and fetishes via a process sometimes referred to as "coupling." *See, e.g.*, Jeremy Mast, How Porn Induces Sexual Fetishes – And What You Can Do About Your Fetish, Center for Integrative Change *Can Pornography Use Lead to Unwanted Sexual Fetishes?*, Walk in Integrity https://www.centerforintegrativechange.com/blog/how-porn-induces-sexual-fetishes-and-what-you-can-do-about-your-fetish (last visited September 25, 2026). "When someone watches pornography, they are exposed to a 'supernormal stimuli' that floods them with artificially high levels of dopamine and other pleasure chemicals. When a fetish is introduced in that environment, the brain begins to associate the fetish, be it an act or object or particular body part, with that

supernormal stimuli and those pleasure chemicals. In other words, the fetish becomes coupled ('joined' or 'associated') with that sexual experience." *Id.* (see also Gary Wilson, *Your Brain on Porn: Internet Pornography and the Emerging Science of Addiction* (2014) available at https://www.dirzon.com/file/telegram/somali%20educational%20books/Your_Brain_on_Porn_Internet_Pornography_and_the_Emerging_Science.pdf (last visited September 25, 2026) ("However our preferences arise, our brains evolved to record what turns us on. This phenomenon rests on a crucial neural principle: Nerve cells that fire together wire together. Briefly, the brain links together the nerve cells for sexual excitement (in the reward circuit) with the nerve cells that store memories of the events associated with the excitement.")

This is precisely how Leftwich came to find himself here. An interest in adult pornography evolved through the process of "coupling" into an interest in child pornography. Unfortunately, Leftwich did not seek professional help to overcome that addiction and instead continued to give in to it to the point that it eventually led to him committing the instant contact offense. At no point did Leftwich believe what he was doing (or what he eventually did do) was acceptable. However, rather than acting as an impetus for him to seek help, his shame and embarrassment caused Leftwich to shy away from reaching out.

The instant case appears to involve a single instance of Leftwich producing child pornography depicting sexual conduct he engaged in with his girlfriend's daughter. That event occurred nearly a decade before Leftwich was arrested on the

instant case, and there is no suggestion, let alone evidence, that he ever engaged in that behavior again or that he shared the videos with anyone else.

In sum, psychological research helps us understand and explain (without excusing) how Leftwich arrived at this point despite knowing that his conduct was wrong and severely regretting his actions. He is deeply remorseful and hopes that the psychological and emotional damage he caused may one day be healed.

**(2) The need for the sentence imposed to:**

- **a. Reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment;**
- **b. Afford adequate deterrence to criminal conduct;**
- **c. Protect the public from further crimes of the defendant; and**
- **d. Provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;**

As to the first two goals, Leftwich fully understands the serious nature of his conduct and its effect on the victim as well as his own family. Coupled with the stigma of being a sex offender, particularly one who engaged in a contact offense and produced images of it, 210 months is a significant sentence that will reflect the seriousness of the offense, promote respect of the law, and provide just punishment. Regardless of the sentence imposed (and regardless of whether he had ever been caught), Leftwich will live the rest of his life with the guilt, shame, remorse, and other demons created by his actions. Since he will not be eligible for Earned Time Credits, Leftwich would be nearly 65 years old when he is released and still subject to a significant term of supervised release and a sex offender registration requirement. The public will be well-protected during his time in custody and upon his release. A

longer sentence would likely be a death sentence given the effect of incarceration on life expectancy in the United States. *See, e.g.*, Sebastian Daza et al., *The Consequences of Incarceration for Mortality in the United States*, Demography, 577-598 (2020) [https://read.dukeupress.edu/demography/article/57/2/577/168006/The-Consequences-of-Incarceration-for-Mortality-in](https://read.dukeupress.edu/demography/article/57/2/577/168006/The-Consequences-of-Incarceration-for-Mortality-in) (last visited September 24, 2026).

As to the third prong, several studies have revealed that for older offenders like Leftwich, the recidivism rates are lower than expected, particularly for those who receive sex offender treatment while in the community. One study of persons convicted of child sexual abuse and who desisted from further crimes, found that "individuals who desisted from reoffending did more than address their sexual offense-related needs; they appeared to achieve some degree of lifestyle stability, and this highlights the importance of social reintegration among this population." Michael Lasher & Robert McGrath, *Desistance from Sexual and Other Violent Offending Among Child Sexual Abusers*, 20 Crim. Justice & Behav. 1 (2016). "The research indicates that treatment in the community is more effective than treatment in institutions. Although there may be obstacles to changing existing exclusionary policies, evidence demonstrates that sex offenders, both adolescent and adult, can be treated successfully in community settings." Bitna Kim et al., *Sex Offender Recidivism Revisited: Review of Recent Meta-analyses on the Effects of Sex Offender Treatment*, 17 Trauma, Violence, and Abuse 1, 11 (2016).

"For the most part, older offenders [50 years or older] showed low base rates of sexual recidivism regardless of the risk band into which they fell." Terry Nicholaichuk

et al., *Age, Actuarial Risk, and Long-Term Recidivism in a National Sample of Sex Offenders*, 26 Sexual Abuse: A Journal of Research and Treatment 406 (2014). This study examined rapists, extrafamilial child molesters, and intrafamilial child molesters (incest). It found "very few recidivists among the sexual offenders released after age 60 (5 of 131 or 3.8%). The older-than-60 recidivists included two extrafamilial child molesters (2 of 45 or 4.4%) and three unclassified offenders (3 of 37 or 8.1%). None of the incest offenders (n = 39) or rapists (n = 10) released after age 60 recidivated. The oldest recidivist in the sample was released at age 72 and was reconvicted for a sexual offense the following year." Karl Hanson, *Recidivism and Age: Follow-Up Data from 4,673 Sexual Offenders*, 17 J. of Interpersonal Violence 1046, 1054 (2002). "[A]ge at release was found to be associated with sexual recidivism, with offenders above the age of 50 reoffending at a very low rate." Looman & Jeffrey Abracen, *Comparison of Measures of Risk for Recidivism in Sexual Offenders*, 25 J. of Interpersonal Violence 781, 803 (2010).

As to the final factor, it is well-recognized that the BOP is ill-equipped to provide quality medical care for many chronic conditions, resulting in substandard treatment, harsh conditions, and increased costs. The Office of Inspector General found that "recruitment of medical professionals is one of the BOP's greatest challenges and staffing shortages limit inmate access to medical care, result in an increased need to send inmates outside the institution for medical care, and contribute to increases in medical costs." U.S. Dept. of Justice, Office of the Inspector General, *Review of the Federal Bureau of Prisons' Medical Staffing Challenges* i

(2016), https://oig.justice.gov/sites/default/files/reports/e1602.pdf (last visited September 24, 2026).

The BOP's shortcomings in providing adequate medical care are particularly relevant to Leftwich's case given his numerous conditions, challenges in treating those conditions, and the way in which those conditions affect his day-to-day life. Starting with his back pain, Leftwich is forced to lay flat for the vast majority of the day as sitting upright results in too much compression on his spine. Indeed, he describes sitting in a vehicle during transport to court as "torturous." Standing up, even to move around or just to shower (which he does approximately once per week), is extremely painful for him and must be limited to short, tolerable durations. Without adequate medical care, including appropriate medication and physical therapy, he is effectively bedridden. In addition, he anticipates needing additional back surgeries in the future, including ablations, to help manage the pain.

His spinal cord stimulator does not improve the situation, and in a custodial setting presents an added risk. Specifically, the stimulator is controlled by a remote device that can turn the stimulator off and on and adjust the intensity. If another inmate were to steal the remote, that person could torture Leftwich by turning the setting all the way up (which would be extremely painful, essentially shocking him to death) or deprive him totally of the benefit of the stimulator. If the remote is lost or destroyed, the stimulator would be stuck in its current state in perpetuity until another remote can be obtained and installed – there is no override switch or ability to control the stimulator without the remote.

His back issues further complicate his GI problems, which arise out of his IBS and irregular bowel tract. Specifically, despite attempting to treat these issues with medications, Leftwich still goes through approximately one (1) entire roll of toilet paper each day. Sitting for long periods of time, particularly during transport, presents a risk that he may defecate on himself. Conversely, sitting on the toilet for long durations is also very painful for his back. Notably, throughout the year-plus that he has been in custody, he has not been able to see a specialist for his GI issues.

As noted above, Leftwich also suffers from sleep apnea, hypertension, and glaucoma. Although it is anticipated that the BOP will be better positioned to manage those conditions, including providing access to a CPAP machine that he is unable to have at Carter County, it must still be recognized that those conditions contribute to Leftwich requiring a diverse and complex course of medical treatment throughout his sentence. His mere existence while in custody will be far more difficult than the average inmate even in the unlikely event that he receives adequate medical care. He reports fearing that his body may not even survive 10-15 years in custody, let alone the 210-month sentence he is requesting. It is this factor – the need to provide medical care in the most effective manner (and the resulting harshness of BOP medical care on an individual with Leftwich's medical needs) – that presents the most compelling case for a 210-month sentence.

**(3) The kinds of sentences available;**

The requested sentence is within the statutory range.

**(4) The kinds of sentence and the [Guideline] sentencing range;**

The agreed-upon sentencing range of 210-262 months contained in the Rule 11(c)(1)(C) plea agreement reflects a Guideline calculation that does not include the five-level enhancement for a "pattern of activity" under § 4B1.5(b), and thus reflects the range based on a Total Offense Level of 37 and Criminal History Category of I. According to the Sentencing Commission's JSIN tool, "[d]uring the last five fiscal years (FY2021-2025), there were 187 defendants whose primary guideline was §2G2.1, with a Final Offense Level of 37 and a Criminal History Category of I, after excluding defendants who received a §5K1.1 substantial assistance departure. For the 187 defendants (100%) who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 198 month(s) and the median length of imprisonment imposed was 210 month(s)." Based on that data, a sentence at the bottom of the agreed-upon range would be consistent with similarly-situated defendants within the last five years.

**(5) Any pertinent policy statement;**

The requested sentence is not precluded by any pertinent policy statement.

**(6) The need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and**

To further establish by a 210-month sentence is appropriate in this case, counsel would direct the Court to *United States v. Roatsey*, 2:21-cr-00235, where in Roatsey was convicted of violating the same statute, 18 U.S.C. § 2251(a), and sentenced to 300 months in prison. Todd Roatsey was an elementary school counselor

who, over the course of twenty years, engaged in an egregious pattern of sexual misconduct that included having sex with underage girls, pretending to be a teenage boy on Snapchat to produce child pornography, pretending to be a teenage boy on Snapchat to engage in sexually inappropriate conversations with minors he knew through his employment, collecting and distributing child pornography, and other conduct more fully set forth in the Government's sentencing memorandum from that case. *See United States v. Roatsey*, 2:21-cr-0025 ECF No. 80 (Gov't Sentencing Memo). By contrast, Leftwich's conduct is far less egregious. Failing to sentence Leftwich to a term of imprisonment well below that of Roatsey, and more specifically at the bottom of the agreed-upon range, would create an unwarranted similarity in the sentences of individuals whose conduct is vastly different.

**(7) The need to provide restitution to any victims of the offense.**

Numerous victims have requested restitution in this matter. Counsel is attempting to negotiate with counsel for the victims as to the claimed amounts and may request that the Court reconvene this matter for a hearing solely as to the issue of restitution at a later date. If such a request is made, Leftwich would waive his right to be present for that hearing to avoid the need to be transported back to court.

## III. CONCLUSION

WHEREFORE, for the reasons set forth herein, Marlon Leftwich requests that the Court impose a sentence of 210 months' imprisonment.

Respectfully submitted this 28th day of September 2026.

**MARLON LEFTWICH**

By Counsel

**WESLEY P. PAGE**
**FEDERAL PUBLIC DEFENDER**

**s/ Wesley P. Page**
Wesley P. Page, Bar No. 10529
Federal Public Defender
300 Virginia Street, East, Room 3400
Charleston, West Virginia 25301
Telephone: (304) 347-3350
Facsimile: (304) 347-3356
E-mail: wesley_page@fd.org